UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA *ex rel.*
DAVID A. VELTZ,

                                        Plaintiff,

        v.                                                              **DECISION and ORDER**
                                                                          01-CV-190S
ALLEGANY REHABILITATION
ASSOCIATES, INC.,

                                        Defendant.

## I. INTRODUCTION

In this *qui tam* action, the government and the Relator, David A. Veltz, allege that

Defendant Allegany Rehabilitation Associates, Inc., submitted fraudulent claims for

Medicaid reimbursement and retaliated against Veltz in violation of the False Claims Act

("FCA"), 31 U.S.C. §§ 3729 *et seq.*  Presently before this Court is Allegany's Motion for

Partial Summary Judgment on certain of Veltz's FCA Medicaid-reimbursement claims.

(Docket No. 87.)  For the following reasons, Allegany's motion is granted in part and denied

in part.

## II. BACKGROUND

Allegany is a nonprofit corporation that provides outpatient mental health

rehabilitation services and continuing day treatment programs in Allegany and Wyoming

counties.  (Allegany's Statement,[1] Docket No. 87-27, ¶ 2.)  Allegany provides services to

---

[1]The parties' Rule 56 Statements of Undisputed Facts contain citations to the record evidence.
This Court has confirmed and is satisfied that the evidence cited supports the assertions therein.  Cf. Holtz
v. Rockefeller & Co., Inc., 258 F.3d 62, 74 (2d Cir. 2001) (holding that factual allegations contained in a
Rule 56 Statement that find no support in the record evidence must be disregarded and the record
reviewed independently).

Medicaid-eligible clients and submits claims for reimbursement to Medicaid.  (Allegany's Statement, ¶ 3.)

Veltz worked at Allegany from 1989 until Allegany terminated his employment on March 26, 1999.  (Allegany's Statement, ¶ 1; Relator's Statement, Docket No. 93, ¶ 1.) In January 1999, Veltz reported to Jennifer Foth, Allegany's personnel coordinator, what he perceived to be wrongful billing practices as it related to Allegany's (1) upcoding (billing Medicaid at a higher rate code for services provided), (2) billing Medicaid for non-reimbursable services provided during weekend continuing day treatment programs, and (3) billing Medicaid for continuing day treatment services for clients who attended a wedding at the Wellsville treatment facility in August 1998.  (Relator's Statement, ¶¶ 2, 3, 19.)

Foth advised Veltz to bring his concerns to Allegany's Board of Directors, which he did. (Relator's Statement, ¶¶ 3, 4.) Veltz discussed his concerns with Board Chair Eugene Krumm.  (Relator's Statement, ¶ 4.)   Veltz maintains that Krumm was hostile towards him and asked him to quit his job before hanging up on him.  (Relator's Statement, ¶ 4.)  After this conversation, Veltz declined Foth's further request to submit his allegations in writing, fearing that doing so would lead to his termination.  (Relator's Statement, ¶ 5; Allegany's Statement, ¶¶ 6, 7.)  In March 1999, Veltz reported his concerns to the Medicaid Fraud Control Unit.  (Relator's Statement, ¶ 14.)

A.    **Upcoding**

Veltz maintains that beginning in 1995, Allegany improperly billed Medicaid for continuing day treatment services.  (Relator's Statement, ¶ 6.)  In 1995, Medicaid required Allegany to transition to an electronic claims-submission system.  (Allegany's Statement,

¶ 8.)  As a result, Allegany installed and used a billing software program called Integral. (Allegany's Statement, ¶ 9; Relator's Statement, ¶¶ 6, 7.)  But difficulties with Integral arose, including that the program would automatically replace correctly-entered rate codes with incorrect ones.  (Allegany's Statement, ¶ 9; Relator's Statement, ¶¶ 6, 7.)  These errors resulted in both upcoding and downcoding, which in turn resulted in overpayment and underpayment by Medicaid.  (Allegany's Statement, ¶ 10; Relator's Statement, ¶ 7.) Integral did not, however, have the capability to correct errors or repay overpayments. (Relator's Statement, ¶¶ 7, 9.)

After Allegany discovered the problems with Integral, it developed an internal corrective procedure and implemented additional billing software called DARRESS to correct the coding errors.  (Allegany's Statement, ¶¶ 12, 13.)  Veltz admits that Allegany devoted resources to correcting the problems with Integral, but claims that Allegany used individuals who lacked experience in Medicaid billing.  (Allegany's Statement, ¶ 9.)  Veltz further maintains that despite knowing of the problems with Integral, Allegany continued to use it through 1999.  (Relator's Statement, ¶ 8.)

Veltz contends that the shortcomings with Integral resulted in 79 instances of upcoding in 1995, with evidence of repayment by Allegany in only 9 cases.  (Relator's Statement, ¶ 10.)  Allegany maintains that overpayments it received from 1994-1996, even assuming no adjustments were made, total only $1,466.  (Allegany's Statement, ¶ 26.)

Also during this time period, the New York State Department of Health audited Allegany's Medicaid billing practices from January 1, 1993, through December 31, 1995. (Allegany's Statement, ¶ 17.)  The Department of Health reviewed a random sample of 100 claims submitted for reimbursement in 1994 and 1995, and then extrapolated from those

3

claims to determine that Medicaid overpaid Allegany $80,278 during that time period. (Allegany's Statement, ¶ 17.)  Allegany paid $80,278 to settle the overpayment claims. (Allegany's Statement, ¶¶ 18, 19.)

**B.     Saturday Continuing Day Treatment Program**

Beginning in 1994, Allegany began billing Medicaid for its Saturday continuing day treatment program.  (Relator's Statement, ¶ 11.)  This program continued though 1999. (Relator's Statement, ¶ 11.)  Veltz maintains that the Saturday program was plagued by compliance issues, including improper staffing, lack of medical necessity, and lack of scheduled therapeutic activity.  (Relator's Statement, ¶ 12.)  For example, regulations suggest a staffing ratio of one clinical staff member for every ten clients, which Veltz maintains Allegany failed to comply with on numerous occasions in 1996 and 1998.[2] (Relator's Statement, ¶¶ 16, 17.)

**C.     The August 1998 Wedding**

On August 28, 1998, two patients were married during the Saturday program at the Wellsville treatment facility.  (Relator's Statement, ¶ 13.)  At the direction of John Mahinis, the Program Director, Allegany billed Medicaid for the clients who attended the wedding, which took place during a time when programming would normally have been provided. (Relator's Statement, ¶ 13; Allegany's Statement, ¶ 15.)  Allegany admits billing Medicaid as alleged, but notes that it subsequently reversed its charges and returned the overpayment to Medicaid.  (Allegany's Statement, ¶¶ 14-16.)  According to Veltz, Allegany

---

[2] Relator claims that he is unable to assess Allegany's compliance for additional years because Allegany lost, misplaced, or destroyed records for the years 1994, 1995, 1997, and 1999.  (Relator's Statement, ¶ 18.)

4

repaid Medicaid only after he spoke to the Board of Directors and the Medicaid Fraud Control Unit in 1999.  (Relator's Statement, ¶ 15.)

### III. DISCUSSION

**A.    Summary Judgment Standard**

Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c). A fact is "material" if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  An issue of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.

In deciding a motion for summary judgment, the evidence and the inferences drawn from the evidence must be "viewed in the light most favorable to the party opposing the motion." Addickes v. S.H. Kress and Co., 398 U.S. 144, 158-59, 90 S. Ct.1598, 1609, 26 L. Ed. 2d 142 (1970).  "Only when reasonable minds could not differ as to the import of evidence is summary judgment proper."  Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991).  The function of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Anderson, 477 U.S. at 249.  "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."  Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996).

But a "mere scintilla of evidence" in favor of the nonmoving party will not defeat

summary judgment.  <u>Anderson</u>, 477 U.S. at 252.  A nonmoving party must do more than cast a "metaphysical doubt" as to the material facts; it must "offer some hard evidence showing that its version of the events is not wholly fanciful."  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); <u>D'Amico v. City of N.Y.</u>, 132 F.3d 145, 149 (2d Cir. 1998).  That is, there must be evidence from which the jury could reasonably find for the nonmoving party.  <u>Anderson</u>, 477 U.S. at 252.

**B.    Allegany's Motion for Partial Summary Judgment**

Allegany seeks partial summary judgment on Veltz's FCA reimbursement claims. First, it contends that the Medicaid-reimbursement claims for 1994-1995 and 2000-2001 must be dismissed because Allegany has already resolved those claims via settlement, or alternatively, because this Court lacks subject-matter jurisdiction over them.  Second, it argues that Veltz's Medicaid-fraud claims must be dismissed because they are contrary to the regulations and Veltz has failed to produce evidence of fraudulent intent.

**1.    Medicaid-Reimbursement Claims**

**a.    1994-1995**

As discussed above, the New York State Department of Health conducted an audit of Allegany's Medicaid payments from January 1, 1994, through December 31, 1995. (Affidavit of Leonard Jakovac ("Jakovac Aff."), Docket No. 87-11, Exhibits D and E.) Extrapolating from a random sample of 100 claims, auditors determined an amount that Medicaid allegedly overpaid to Allegany.  (Jakovac Aff., ¶ 13.)  Allegany settled claims arising out of the audit for $80,278.  (Jakovac Aff., ¶ 13 and Exhibit C.)  The settlement was between Allegany and the New York State Department of Health, and was in full

satisfaction of all overpayments falling within the scope of the audit spanning the period January 1, 1994, through December 31, 1995.  (Jakovac Aff., Exhibit C.)

Allegany maintains that this settlement forecloses Veltz's claims involving overpayments in 1994-1995, under the doctrine of accord and satisfaction.  Veltz counters that accord and satisfaction does not apply.

"An accord and satisfaction is a method of discharging a contract or settling a cause of action arising from a contract or a tort, by substituting for such contract or cause of action an agreement for the satisfaction thereof and an execution of such substituted agreement."  City of Amsterdam v. Daniel Goldreyer, Ltd., 882 F. Supp. 1273, 1279-80 (E.D.N.Y. 1995).  An accord and satisfaction is enforceable only to the extent that the parties had authority to settle the dispute.  U.S. ex rel. Mayman v. Martin Marietta Corp., 894 F. Supp. 218, 224 (D.Md. 1995).  The defendant bears the burden of proving accord and satisfaction as an affirmative defense.  Id. at 1280.

Here, the $80,278 settlement binds only Allegany and the New York Department of Health.  The New York Department of Health has no authority to settle FCA claims; that authority is vested in the United States Attorney General and the United States Department of Justice.  See Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc., 524 F.3d 1229, 1234 (11th Cir. 2008) ("The government has substantial authority over the action because the FCA vests the government with several significant procedural controls, including . . . the right to veto or approve a settlement."); see also 31 U.S.C. §§ 3730 (b) and (c).  Accordingly, the doctrine of accord and satisfaction does not bar Veltz's FCA claims.

Allegany next argues that this Court lacks subject-matter jurisdiction over the 1994-1995 claims because the claims were publicly disclosed through the audit process and

7

Veltz is not an original source.  Veltz maintains that he is an original source of information, such that subject-matter jurisdiction is proper.

Under the version of the FCA applicable to this case,[3] subject-matter jurisdiction is absent if the action is based upon

> the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730 (e)(4)(A) (2009).

To bar subsequent FCA claims, public disclosure must be through one of the enumerated sources in § 3730 (e)(4)(A) and must be of the information that forms the basis of the claims.  See United States ex rel. Kirk v. Schindler Elevator Corp. (Kirk II), 601 F.3d 94, 103 (2d Cir. 2010) (citing United States ex rel. Doe v. John Doe Corp., 960 F.2d 318, 322-23 (2d Cir. 1992)).  If public disclosure is established, jurisdiction is saved only if the relator can establish that he or she was the "original source" of the relevant information.  See Kirk II, 601 F.3d at 103.  An "original source" is "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information."  31 U.S.C. § 3730 (e)(4)(B).

Here, Allegany argues that Veltz's 1994-1995 claims were publicly disclosed through

---

[3]The language of 31 U.S.C. § 3730(e)(4) has changed since this suit was filed, when the President signed into law the Patient Protection and Affordable Care Act, Pub.L. 111-148, 124 Stat.119, on March 23, 2010.  The United States Supreme Court has held, however, that the change in the statute is not retroactive.  Graham County Soil and Water Conservation Dist. v. United States, __ U.S. __, 130 S.Ct. 1396, 1400 n.1, 176 L.Ed.2d 225 (2010).  Thus, the version of the statute in effect during the pendency of this action governs and all citations are to that version.

the New York Department of Health audit.  With little explanation, Veltz maintains that not all of the facts underlying his claims were publicly disclosed through the audit.

The scope of the audit, which covered January 1, 1994, through December 31, 1995, was to

> ensure [Allegany's] compliance with applicable Federal and State laws, regulations, rules and policies governing the New York State Medical Assistance Program for the Needy, Medicaid, and to verify that
>
>> [1] Medicaid reimbursable services were rendered for the dates billed;
>>
>> [2] appropriate rate or procedure codes were billed for services rendered; and
>>
>> [3] patient related records contained the documentation required by the regulations.

(Jakovac Aff., Exhibit D.)

Veltz concedes that the upcoding allegations were publicly disclosed in the audit, but maintains, again without explanation, that his other claims are distinct.  But as far as this Court can glean from the record, Veltz's 1994-1995 claims all involve the propriety of Allegany's billing, coding, documentation, and rendering of services.  These claims fall within the New York Department of Health audit, which publicly disclosed these irregularities before Veltz filed his complaint in this case.  Veltz has identified no specific claims from 1994-1995 falling outside of these classifications that were not publicly disclosed in the audit.

The parties also discuss whether the New York Department of Health audit qualifies as an enumerated source under § 3730 (e)(4)(A).  Only public disclosure through an enumerated source poses a jurisdictional bar.  The United States Supreme Court,

however, has recently settled this issue by interpreting § 3730 (e)(4)(A) to include public disclosures made through state or local reports, audits, or investigations, which would include the New York Department of Health audit at issue here. Graham County Soil and Water Conservation Dist. v. United States, __ U.S. __, 130 S.Ct. 1396, 1400 n.1, 176 L.Ed.2d 225 (2010).

Accordingly, this Court finds that the facts underlying Veltz's 1994-1995 claims were publicly disclosed through an enumerated source within the meaning of § 3730 (e)(4)(A) through the New York Department of Health audit.

But this finding does not end the inquiry. As discussed, jurisdiction is saved if Veltz can demonstrate that he is an "original source" of the information underlying the claims. 31 U.S.C. § 3730 (e)(4)(B). To do so, he must demonstrate that he had direct and independent knowledge of the information on which his allegations are based and that he provided that information to the federal government pre-suit.[4] Id. Veltz argues that he gained direct and independent knowledge of the improprieties at Allegany through his employment; Allegany argues that he learned his information through the audit.

Veltz worked at Allegany from 1989 to 1999, during which time he held various positions, including case manager, job coach, program aide, and social club assistant. (Affidavit of David Veltz ("Veltz Aff."), Docket No. 94, ¶ 2.) From the summer of 1994 through November 1995, Veltz worked in the Saturday continuing day treatment program, which is the subject of several of his claims. (Veltz Aff., ¶¶ 3-5.) As such, Veltz had direct

---

[4]The United States Supreme Court has made clear that a relator's "direct and independent knowledge" must be of the information underlying the relator's suit, not the information that underlies the public disclosure. Rockwell Int'l Corp. v. United States, 549 U.S. 457, 471-73, 127 S.Ct. 1397, 167 L.Ed.2d 190 (2007).

and independent knowledge of the workings of that program, including the information that underlies his claims that the program suffered from compliance issues, including improper staffing, lack of medical necessity, and lack of scheduled therapeutic activity.  (Relator's Statement, ¶ 12; Veltz Aff., ¶¶ 5-10.)

Veltz has not, however, demonstrated that he is an original source for information supporting his upcoding claims involving Integral during 1994-1995, which were publicly disclosed through the New York Department of Health audit.  In fact, he testified at his deposition that he was "really not very familiar with the billing practices" and that he learned of possible deficiencies through a co-worker.  (Veltz Deposition, Docket No. 95-16, p. 137.) Thus, by his own admission, Veltz lacks direct and independent knowledge of those claims, and is therefore not an original source.

Accordingly, for Veltz's 1994-1995 claims, this Court has subject-matter jurisdiction over only Veltz's claims involving the compliance issues related to the Saturday continuing day treatment program, and those claims will proceed.  All other claims from 1994-1995 were publicly disclosed through the New York Department of Health audit and Veltz has not established that he is an original source for those claims, thus divesting this Court of jurisdiction under § 3730 (e)(4).  Summary judgment in Allegany's favor on those claims is therefore granted.

### b.    2000-2001

Veltz has withdrawn any claims against Allegany for years beyond 1999.  (Plaintiff's Memorandum of Law, Docket No. 92, p. 8 n. 4.)  Summary judgment in Allegany's favor will therefore be granted.

11

### 2.    Medicaid-Fraud Claims

To establish an FCA claim, the plaintiff must prove that the defendant "(1) made a claim, (2) to the United States government, (3) that is false or fraudulent, (4) knowing of its falsity, and (5) seeking payment from the federal treasury."  Mikes v. Straus, 274 F.3d 687, 695 (2d Cir. 2001).  Allegany argues that it is entitled to summary judgment on Veltz's Medicaid-fraud claims because they are contrary to the governing regulations and Veltz has produced no evidence of fraudulent intent.  Veltz maintains that other than for split-billing, his claims are proper.

First, Allegany argues that it properly billed Medicaid by the split-billing method, in compliance with 14 NYCRR § 588.11(a)(3)(ii).  In response, Veltz concedes that the incidents of split-billing were billed correctly and withdraws his split-billing claims. (Plaintiff's Memorandum of Law, p. 18.)  Summary judgment will therefore be granted to Allegany.

Second, Allegany argues that the billing issues attributable to its use of the Integral software were inadvertent and innocent mistakes.  It also maintains that it reversed several of the alleged overcharges and that many of the billing errors resulted in minimal overcharges.  As a result, Allegany contends that it is entitled to summary judgment because Plaintiff has not offered any evidence that Allegany intended to deceive Medicaid in connection with the submitted claims.

The record contains conflicting evidence on this point, thereby precluding an award of summary judgment.  Allegany has presented evidence by way of the Jakovac Affidavit that it made efforts to correct the billing irregularities and that the overbilling was minimal. Veltz, on the other hand, has submitted evidence by way of the deposition of former billing

clerk Tisa Robbins, from which it could reasonably be concluded that Allegany knew of the problems with its software beginning in 1994, yet allowed overbilling to continue through 1999. (Deposition of Tisa Robbins, Docket No. 95-7.) Moreover, it is a question of fact whether Allegany worked diligently to correct its software problems, or whether, as Veltz contends, it made a business decision not to purchase and install new software. Based on this evidence, a reasonable jury could find that Allegany's continued use of defective software, which it knew generated incorrect claims for Medicaid reimbursement, constitutes knowingly presenting false claims for payment to the federal government. Summary judgment on these claims is therefore denied.

Third, Allegany argues that it is entitled to summary judgment on Veltz's claim that Allegany falsely certified that it was entitled to payment for its continuing day treatment program. Veltz maintains that Allegany was not in compliance with 14 NYCRR § 587.15 because its staffing ratios were too low on multiple occasions. Allegany contends that the regulation does not require specific staffing levels.

Veltz's claim presents an implied legally-false certification theory of liability. The theory is based on the notion that the submission of a claim for reimbursement itself implies that the defendant has complied with all preconditions to payment. See Mikes, 274 F.3d at 699. For medical providers, "implied false certification is appropriately applied only when the underlying statute or regulation upon which the plaintiff relies *expressly* states the provider must comply in order to be paid." Id. at 699 (emphasis in original).

Veltz cites two regulations in support of its claim. First, under 18 NYCRR § 505.25 (d)(1), all programs must meet certain prescribed standards, including those set forth in 14 NYCRR Parts 587 and 588, in order to bill under the Medical Assistance Program.

13

Fourteen NYCRR § 587.15 (a) requires that a provider "continuously employ an adequate number and appropriate mix of staff to carry out the objectives of [its outpatient programs] and to assure the outcomes of the program."  For continuing day treatment programs, the regulation requires that the provider "maintain an adequate and appropriate number of clinical staff members on site in proportion to the number of recipients on site."  14 NYCRR § 587.15 (d).  This requirement is deemed satisfied if there is one clinical staff member on site for every ten recipients.  14 NYCRR § 587.15 (d)(1).

Allegany concedes that evidence in the record establishes multiple instances when its staffing fell below a 1:10 ratio.  The thrust of Allegany's argument, however, is that the regulation does not *require* 1:10 staffing, but rather, identifies such a staffing ratio as but one way of maintaining an "adequate and appropriate number of clinical staff members."  14 NYCRR § 587.15 (d).  Consequently, Allegany argues that Veltz's claims are inconsistent with the regulation.

This Court agrees with Allegany's construction of the regulation.  The only requirement is that there be adequate and appropriate staffing in proportion to the patients served.  See 14 NYCRR § 587.15 (d) (". . . programs *shall* maintain an adequate and appropriate number of clinical staff members on site in proportion to the number of recipients on site")(emphasis added).  Staffing in a 1:10 ratio presumptively satisfies this requirement, but the regulation does not *require* such staffing.  See id. ("Providers shall be *deemed* to have met such standards . . . .") (emphasis added).  The regulation leaves open the possibility that adequate and appropriate staffing could be otherwise achieved.

But Veltz's claim is that Allegany failed to provide adequate and appropriate staffing by not adhering to what could reasonably be construed as a recommended staffing ratio

14

— 1:10.   The question is not whether Allegany provided staffing in a ratio of 1:10 (or whether the regulation requires such staffing); it is whether its staffing was "adequate and appropriate." This is a factual inquiry that must be resolved by the factfinder.   And there can be little doubt that material questions of fact exist concerning the cause of Allegany's alleged understaffing and whether the incidents of alleged understaffing discovered by Veltz could be construed as a pattern of providing less than "adequate and appropriate" staffing.   If Allegany's staffing was adequate and appropriate, then Allegany's claim for reimbursement for those services was proper.   If it was not, Veltz's implied certification theory could succeed because compliance with 14 NYCRR § 587.15 is required for payment by way of 18 NYCRR § 505.25 (d)(1).   Summary judgment in Allegany's favor must therefore be denied.

## IV. CONCLUSION

For the reasons stated above, Allegany's Motion for Partial Summary Judgment is granted in part and denied in part.   But for his claims involving compliance issues relating to Allegany's Saturday continuing day treatment program, Veltz's claims from 1994-1995 are dismissed for lack of subject-matter jurisdiction.   Additionally, Allegany is granted summary judgment on Veltz's claims that post-date 1999 and any claims involving split-billing.   In all other respects, Allegany's Motion for Summary Judgment is denied.

**V. ORDERS**

IT HEREBY IS ORDERED, that Allegany's Motion for Partial Summary Judgment

(Docket No. 87) is GRANTED in part and DENIED in part consistent with this decision.


SO ORDERED.


Dated:          March 17, 2011
                Buffalo, New York


                                        /s/William M. Skretny
                                        WILLIAM M. SKRETNY
                                        Chief Judge
                                        United States District Court